# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
September 14, 2004 Session

## STATE OF TENNESSEE v. BRANDON WALLACE

**Appeal from the Circuit Court for Lauderdale County**
No. 7346-D     Joseph H. Walker, III, Judge

---

**No. W2003-01967-CCA-R3-CD  - Filed January 28, 2005**

---

The defendant, Brandon Wallace, was convicted by a jury of two counts of attempted first degree murder (Counts 1 and 2); attempted second degree murder (Count 3); attempted especially aggravated robbery (Count 4); especially aggravated burglary (Count 5); and felony reckless endangerment (Count 6).  He was sentenced as a Range I, standard offender to twenty-three years in the Department of Correction for Counts 1 and 2, to be served consecutively; ten years for Count 3, to be served concurrently with Counts 1 and 6; ten years for Count 4 which the trial court merged with Count 5, for which he also was sentenced to ten years, to be served consecutively to Count 1 and concurrently with Count 2; and two years for Count 6, to be served concurrently with Counts 1 and 3, for a total effective sentence of forty-six years.  Additionally, the jury set fines totaling $138,000, which were reduced by the trial court to $1,000.  The defendant raises two issues on appeal:  (1) whether the evidence was sufficient to support his convictions, excluding his felony reckless endangerment conviction; and (2) whether the trial court erred in sentencing. Following our review, we affirm the judgments of the trial court but remand for resentencing and for entry of corrected judgments reflecting the offense date as July 1, 2002.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed and Remanded for Resentencing and Entry of Corrected Judgments**

ALAN E. GLENN, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and NORMA MCGEE OGLE, J., joined.

William Dan Douglas, Jr., Ripley, Tennessee, for the appellant, Brandon Wallace.

Paul G. Summers, Attorney General and Reporter; Michael Markham, Assistant Attorney General; Elizabeth T. Rice, District Attorney General; and Tracey A. Brewer, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

# BACKGROUND

On July 1, 2002, the defendant and two codefendants, Maurice Garrett and William Bumpus, forced their way into a mobile home in Lauderdale County, intending to rob the owner, Jerome Eisom, of drugs and money. A third codefendant, Tyrese Smith, waited in the driver's seat of the getaway car. A struggle ensued inside the home, and Eisom was shot four times while a visitor in the home, Bobby Harrell, was shot twice. Eisom's live-in girlfriend, Deborah Macklin, was chased by the defendant out of the house, as well as chased and shot at by the driver of the car, but she was not hit. Candi Bynum, a seventeen-year-old cousin of Eisom, and four-year-old Jeremecia Eisom and nine-month-old Jerome Eisom, Jr., the children of Eisom and Macklin, were in the home at the time but were not injured. The defendant and his codefendants fled the scene in the getaway car and three of them, including the defendant, were arrested near Brownsville a short time later.

At trial, Kenan Parker identified his blue 1984 Chevrolet Caprice with brown doors from a photograph shown to him by the State. Parker said he loaned his car to Tyrese Smith's sister on July 1, 2002, and saw the defendant, Smith, Garrett, and Smith's sister leave Dyersburg in his car that day.

Bobby Harrell testified that he and his cousin, Jerome Eisom, were in the back bedroom of Eisom's home on July 1, 2002, playing video games. Someone knocked at the door and Eisom went to answer it. When Eisom opened the door, Harrell heard a gunshot but thought it "sounded like a cup or something fell in the kitchen." He testified, "[W]hat got my attention was when somebody hollered, like, 'Uh-uh,' and I looked down the hallway, and that's when I seen [sic] some guys run in, some guys runs [sic] in with masks and stuff." Harrell attempted to climb out a bedroom window, but Eisom and Garrett came into the bedroom, "scuffling" and "fighting." Garrett was firing his gun as Eisom was holding Garrett, "trying to get them to shoot everywhere but him." During the melee, Garrett's mask came off and he began yelling, "Kill this nigger, kill this nigger." At that time, Bumpus entered the room, pointing his gun at Eisom. Harrell struck Bumpus with a lawn chair, knocking the gun from Bumpus' hand. Bumpus and Harrell struggled for possession of the gun, at which time Bumpus yelled to the defendant, "Kill this nigger. He got my gun. Kill this motherfucker." A bullet fired by Bumpus entered Harrell's back left shoulder and lodged behind his heart. The defendant then shot Harrell in the left buttock, "which put seven holes in [his] small intestine" and left him with a colostomy bag. Harrell testified that, while in the hospital in Memphis, he identified the defendant from a photographic line-up. He explained how he was able to recognize the defendant, who was masked during the attacks: "We had eye contact, and, you know, he was the tallest one, and his braids was [sic] hanging down over the stocking cap. . . . The mask that he had on, it was like right here, like where his nose was, I guess, and then he had the stocking cap like on his forehead. So you know what I'm saying, we had eye contact right before he pulled the trigger at me." Harrell stated he knew Garrett from "a long time ago, a while back," but had never met the defendant before that day.

Haywood County Sheriff's Investigator Mark Williams testified that at about 5:00 p.m. on July 1, 2002, he heard a BOLO ("be on the lookout") over the police radio for a "box-type Chevy with different-colored doors." About twenty minutes later, he spotted the vehicle, occupied by three African-American males, on Highway 87 in Durhamville, began following it, and was eventually joined by other deputies. They followed the vehicle to the Brownsville city limits, where a roadblock had been set up, made a felony stop, and arrested the occupants of the vehicle, which included the defendant. At the time of his arrest, the defendant was wearing an orange cloth glove on his right hand. The deputies also found other gloves, nylon stockings, head scarfs, and an orange bandana in the vehicle, along with four pistols. A "Heritage Rough Rider .22 long rifle revolver" was found in the backseat where the defendant had been sitting, and a "Jennings .22 auto, with one clip in it" was found on the back floorboard.

Lauderdale County Chief Deputy Ted Sutton testified that he and the sheriff were en route to Eisom's residence when they learned the getaway vehicle had been stopped near Brownsville. The defendant, Smith, and Bumpus were arrested and transported separately to the Lauderdale County Jail. Sutton said that the defendant was wearing an orange glove at the time of his arrest, which was recovered from the defendant's jail cell later in the day by another officer.

Ripley Police Officer James Smith testified that he was serving a warrant on an inmate in the Lauderdale County Jail when he overheard Chief Deputy Sutton and the sheriff discussing an orange glove, which apparently had not been recovered, worn by the defendant. Smith entered the defendant's jail cell and found an orange cotton glove rolled up and pressed into the toilet paper holder, hidden by a wad of toilet paper.

Jerome Eisom testified that when he had opened his front door, he saw a blue car sitting in the middle of the road and "two guys were like standing at the corner of the door." One pointed a gun at Eisom, who tried to grab it, but the gun fired and struck Eisom. Then, according to his testimony, "this tall guy comes over the top and shoots me in the shoulder, and so I let the gun go." He and the first man began wrestling down the hallway and ended up in the bedroom. Eisom described the second man who shot him as wearing an "orange bandana, and, you know, he was just gun-crazy, gun-happy and all that. He was just shooting and bouncing around and his little bandana flopping. And he had braids, long braids, and real tall." Eisom identified the defendant in the courtroom as the second man who shot him. He also explained how the three assailants "worked together:"

> A.     They were – well, for instance, [Garrett], one of the guys that I knew, the first guy that his bandana came off, when he dropped his gun, he was telling the other guys, "Come get him. Come get my gun," you know, "They got me." And then the other guy would rush in, you know, and help him out, shoot, whatever he had to do to, you know, assist him.

And then they would tell, "Well, there's one gone that way. You chase her," and all that. But it was just real –

Q. Was there any foul language being shouted out?

A. Yeah, they were hollering, "Kill this motherfucker. Kill these niggers," and all this crazy –

Q. Were they saying it really fast or really slow?

A. Loud and fast, because it was happening so fast, you know. They didn't want us to get their guns, you know, so we could protect ourselves.

. . . .

Q. Okay. All right. How many times were you shot?

A. Four.

Eisom explained that he and Harrell "just laid out like we were dead so they wouldn't shoot us anymore." He testified he was able to identify Bumpus in a photographic line-up because of his "bad eye" and Garrett because Garrett's brother at one time had dated Eisom's cousin. He also recalled an orange bandana, "a lot of pantyhose," some orange gloves, and pistols. Eisom said there were no guns, drugs, or money in his home. On cross-examination, he admitted that he initially failed to tell the deputies that he knew Garrett.

Timothy Green testified he lived with his grandmother across the street from Eisom, his cousin. On July 1, 2002, he saw a "two-tone four-door" Chevrolet car pull up at Eisom's house and an African-American male, who was wearing a stocking cap, force his way into Eisom's home. Green went inside to call the police and, when he came back outside, saw Deborah Macklin running around the house. The driver of the getaway car "took off like he was going to run into her. And then a person in the car stuck his hand out the window and shot four times." Green then helped Macklin inside his house. He said he thought there were four African-American men in the car when it left.

Deborah Macklin testified that when she saw two masked African-American males force their way into her home, she ran out the back door. She did not recall if anyone was behind her but remembered that the car tried to run over her and that she ducked down as someone shot at her. She recalled hearing someone say, "Shoot her, shoot her," as she was running outside.

Ira Lee Welch testified concerning conversations he overhead while he was an inmate in the county jail in July 2002. He heard some men say that "they should have killed Hushpuppy" or

"Puffy." Welch acknowledged telling Investigator Terry Davis that the defendant told another inmate and a jailer that "[he] should have killed Puffy Jerome Eisom that day while [he] was out there." He also acknowledged that Eisom is his cousin.

Special Agent Shelly Betts of the Tennessee Bureau of Investigation Crime Laboratory testified regarding the various ballistics tests she performed on bullets and shell casings recovered from the crime scene, as well as the guns found in the getaway car. She identified the guns as a Bryco Arms Jennings semiautomatic .22 long rifle caliber pistol, a four-shot .22 caliber Derringer, a Heritage Rough Rider .22 long rifle caliber revolver, and a Smith and Wesson .38 special caliber revolver. She compared the slug recovered from the living room wall in Eisom's house to bullets fired through the pistols and determined that the slug, as well as a cartridge case found on Eisom's front porch, had been fired by the Bryco Jennings semiautomatic pistol. Another cartridge case recovered from Eisom's front porch matched the four-shot Derringer. Agent Betts said that other testing on the weapons "failed to reveal the presence of identifiable latent fingerprints."

Codefendant William Bumpus, testifying for the State, said that the first time he met the defendant was on July 1, 2002. He was arrested with the defendant and pled guilty to the attempted second degree murder of Eisom, Macklin, and Harrell, as well as especially aggravated burglary, felony reckless endangerment, and attempted especially aggravated robbery. On the day of the crimes, the defendant, Smith, and Garrett picked up Bumpus at his house and proceeded to Eisom's home in order to commit a robbery of "money and drugs." In the car, Garrett talked about the drugs and money they could steal at Eisom's house:

> Basically, [Garrett] was talking about he knew where he could go get $10,000 – where we could go get $10,000 and some marijuana, so many pounds of weed. And it was like it's at Jerome Eisom's house. And I knew him as Puffy. I didn't know him, but I've heard of him before. And we was on our way there. And then, when we got to Halls, I had second doubts about it. But they wouldn't stop the car and let me out, so we proceeded.

Bumpus stated there were "four or five" loaded guns in the car at the time. At Eisom's residence, Garrett and the defendant got out of the car, ran up to the house, knocked on the door, and ducked down. When Eisom opened the door, they forced their way in and Bumpus heard gunshots. Smith then told Bumpus to go inside:

> So I grabbed my gun, and I go in, and I go straight to the back. And as I'm going in the house, I see a shadow running out the back door. I couldn't see who it was. But I immediately ran to the back where [Garrett] and [the defendant] was [sic]. [The defendant] had passed me on the way to going to the back room where [Garrett] was already at. And then, as I went in, I could see two dead – I mean, I thought they were dead. I could see two bodies laying on their stomachs,

laying on the ground, just laying there. I didn't know if they were dead or what. And I dropped my gun and fell to my knees. And then [Eisom], he turns around on his stomach and grabs my hand, and we get to wrestling. I was scared then. And [Harrell], he does the same. We get to wrestling for my gun. I yelled for help. [The defendant] and [Garrett] come back in and shoot him, and then I just grabbed my gun and we all left.

Bumpus said that Garrett had "the .380," that the defendant had "a .22," and that "over three or four" shots were fired in the back bedroom. Bumpus described the bandana and pantyhose masks they wore as a "last-minute thing" and recalled the defendant's wearing an orange glove as well. He also related the defendant's statements to him in the getaway car after the incident regarding the attempted murder of Macklin:

> Q How did you find out that [the defendant] ran after Deborah Macklin outside the house?
>
> A Oh, he told me in the car.
>
> Q All right. So the defendant, Brandon Wallace, told you in the car that he ran after Deborah, ran her outside the house; is that correct?
>
> A Yes, ma'am.
>
> Q Did he also tell you what happened once he ran her outside the house and the car was outside?
>
> A Uh –
>
> Q Who was left in the car outside?
>
> A Tyrese Smith.
>
> Q All right. Once [the defendant] ran after [Macklin] outside, what did [the defendant] tell you happened at that time?
>
> A He told [Smith] to shoot at her.
>
> Q Okay. So, "Shoot her, shoot her," was something that he said; is that correct?
>
> A Yes, ma'am.

When they left the scene, Garrett was driving but later stopped the car and got out, taking the .380 weapon with him. Smith began driving and, shortly thereafter, Bumpus, Smith, and the defendant were stopped and arrested near Brownsville. On cross-examination, Bumpus testified that the gun he used on July 1, 2002, was "a .22 with four barrels" that would not fire. He denied firing any shots in the back bedroom or on the front porch.

Candi Bynum testified that she was in the living room when three masked African-American men ran in the house and began shooting. Eisom struggled with the first man who came in, and the second man tried to help the first and then chased Macklin out the back door. She identified the defendant in court as the second man. She said she hid behind the couch with Jerome Eisom, Jr., but Jeremecia Eisom got away from her during the incident. She saw the defendant when he came back in the home after chasing Macklin and remembered him having braids.

Lauderdale County Sheriff's Investigator Terry Davis testified he responded to the scene of the shooting where he took photographs and collected evidence, including .22 casings from the front porch and .380 casings from the hallway and bedroom floor. He also took a statement from the defendant after his arrest. After Davis read the defendant his <u>Miranda</u> rights and asked him about the shooting, the defendant began yelling, "F-that, F-this, F-that," so Davis left and returned later. Davis again read the defendant his <u>Miranda</u> rights, and the defendant wrote and signed a statement admitting to being present at Eisom's home but denying that he did any shooting:

> I was asked to ride to Ripley and since I had nothing to do I rode along. In Ripley we went to some trailer on a back road. Who lived there I do not know. At the trailer I went inside after some guy had opened the door. One of the woman [sic] ran out the back and I followed her but I didn't touch her. Outside of the trailer I heard gunshots and ran back in to see who was shot. I didn't see anyone shot at the time because 2 guys were on top of each other. I then left the trailer. I didn't know anyone was going to be shot and I do not know who shot who.

The defendant did not testify or present any proof.

**Sentencing Hearing**

Darrell Smothers, who prepared the defendant's investigation report, testified that the defendant was released from the custody of the Department of Children's Services on his nineteenth birthday on June 14, 2002, and arrested for the present offenses on July 1, 2002. As a juvenile, the defendant had been adjudicated guilty of aggravated assault in Shelby County in 1997 and two counts of aggravated robbery in Dyer County in 2000. The defendant had been in the Department of Children's Services foster care since the age of seven or eight as a result of his parents' incarceration, and had been hospitalized in 1990 or 1991 for depression and behavioral problems.

Gloria Harrell, Bobby Harrell's mother, testified concerning the injuries her son sustained as a result of the shooting. He was airlifted to the Regional Medical Center in Memphis where he underwent surgery to remove much of his small intestine because the bullet that struck him in the buttock "put seven holes in his small intestines." He had a colostomy bag after the surgery which was later removed following reconstructive bowel surgery. Ms. Harrell said her son still has a bullet lodged in the muscle behind his heart which cannot be removed and which could cause his death if it moved forward. As a result of his injuries, Harrell suffers constant pain and cannot "do any factory work" or play with his young son. Ms. Harrell said that her son's hospital bill amounted to almost $30,000 and that his medical treatment was ongoing.

At the conclusion of the hearing, the trial court applied enhancement factor (3), the defendant was a leader in the commission of an offense involving two or more criminal actors, to Counts 1, 2, 4, and 5 and enhancement factor (21), the defendant was adjudicated to have committed delinquent acts as a juvenile that would constitute felonies if committed by an adult. See Tenn. Code Ann. § 40-35-114(3), (21) (2003). The court did not apply any mitigating factors and sentenced the defendant to twenty-three years in Count 1, twenty-three years in Count 2, ten years in Count 3, ten years in Count 4, ten years in Count 5, and two years in Count 6. The court merged Counts 4 and 5 into one conviction. Counts 1, 3, and 6 were ordered to be served concurrently, and Counts 2, 4, and 5 were ordered to be served consecutively to the other counts.

## ANALYSIS

### I. Sufficiency of the Evidence

The defendant contends that the evidence was insufficient to support any of his convictions except that for felony reckless endangerment.

In considering this issue, we apply the familiar rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560, 573 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

First degree murder is defined as the "premeditated and intentional killing of another." See Tenn. Code Ann. § 39-13-202(a)(1) (1997). Premeditation "is an act done after the exercise of reflection and judgment. 'Premeditation' means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time." Id. § 39-13-202(d). Intentional "refers to a person who acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." Id. § 39-11-302(a).

The existence of premeditation is a question for the jury and may be inferred from the circumstances surrounding the killing. See State v. Gentry, 881 S.W.2d 1, 3 (Tenn. Crim. App. 1993). Because the trier of fact cannot speculate as to what was in the defendant's mind, the existence of facts of premeditation must be determined from the defendant's conduct in light of the surrounding circumstances. See State v. Hall, 958 S.W.2d 679, 704 (Tenn. 1997). Several relevant circumstances have been held to provide the requisite indicia of premeditation:

> (1) the use of a deadly weapon upon an unarmed victim;
> (2) the particular cruelty of the killing;
> (3) declarations by the defendant of an intent to kill;
> (4) evidence of procurement of a weapon;
> (5) preparations before the killing for concealment of the crime; and
> (6) calmness immediately after the killing.

State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998) (citing State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997); State v. Brown, 836 S.W.2d 530, 541-42 (Tenn. 1992); State v. West, 844 S.W.2d 144, 148 (Tenn. 1992)). Additionally, a jury may infer premeditation from the defendant's planning activities prior to the killing and prior relationship with the victim, as well as the nature of the killing. Gentry, 881 S.W.2d at 4-5.

The essential elements of the crime of attempted first degree murder include the statutory elements of criminal attempt as set out in Tennessee Code Annotated section 39-12-101. The crime is defined as "an offense directed at the individual whose intent is to commit an offense, but whose actions, while strongly corroborative of criminal intent, fail to achieve the criminal objective intended." Tenn. Code Ann. § 39-12-101, Sentencing Commission Cmts. The three subdivisions of section 39-12-101(a) set out "alternative statutory tests for determining if a course of conduct that does not produce a proscribed harm can be classified as an attempt to commit an offense." Id. Those alternative tests are:

> (a) A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:
>
> (1) Intentionally engages in action or causes a result that would constitute an offense if the circumstances surrounding the conduct were as the person believes them to be;
>
> (2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or
>
> (3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

Tenn. Code Ann. § 39-12-101(a).

The Sentencing Commission Comments to section 39-12-101(a)(2) note that "[i]f an offense is defined in terms of causing a certain result, an individual commits an attempt at the point when the individual had done everything believed necessary to accomplish the intended criminal result."

Taken in the light most favorable to the State, the evidence shows that the defendant forced his way into the victim's home intending to rob the victim of drugs and money. Unprovoked, the defendant shot two unarmed victims. Proof at trial showed the defendant planned the criminal venture with his codefendants as they traveled with loaded weapons in the car from Dyersburg to Ripley. The defendant procured and used head coverings, bandanas, and gloves to conceal his crimes. The evidence further shows that the defendant and his codefendants worked together as a team inside the home, Jerome Eisom testifying that he heard the assailants say differing versions of "Kill them," "Kill this motherfucker," or "Kill these niggers." Only the fact that the victims received medical treatment and lived prevented the intended result of the defendant's actions, namely the deaths of Eisom and Harrell. Therefore, we conclude that the evidence was sufficient for a reasonable jury to have convicted the defendant of the two counts of attempted first degree murder.

To obtain a conviction for attempted second degree murder, the State must prove the attempted "knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(1). A person criminally responsible for the conduct of another may be charged with the commission of the offense. See Tenn. Code Ann. § 39-11-401(b). This theory of guilt is based on the common law provision of criminal liability for principals, accessories before the fact, and aiders and abettors. See id. § 39-11-401, Sentencing Commission Cmts.; see also Presley v. State, 161 Tenn. 310, 30 S.W.2d 231, 233 (1930) (concluding that the aiding and abetting of one brother in holding back bystanders while the other brother attacked his wife rendered the acts of assistance indisputably unlawful). A person is criminally responsible for the conduct of another if, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]" Tenn. Code Ann. § 39-11-402(2).

Criminal responsibility is not a separate crime. See State v. Lemacks, 996 S.W.2d 166, 170 (Tenn. 1999). "It is solely a theory by which the State may prove the defendant's guilt of the alleged offense, . . ., based upon the conduct of another person." Id. To be criminally responsible for the acts of another, the defendant must: "'in some way associate himself with the venture, act with knowledge that an offense is to be committed, and share in the criminal intent of the principal in the first degree.'" State v. Maxey, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994) (quoting Hembree v. State, 546 S.W.2d 235, 239 (Tenn. Crim. App. 1976)). The defendant must "knowingly, voluntarily and with common intent unite with the principal offenders in the commission of the crime." State v. Foster, 755 S.W.2d 846, 848 (Tenn. Crim. App. 1988).

The proof at trial showed, as well, that Tyrese Smith chased Macklin with the getaway car and shot at her at least four times while she was running from the home. This act was committed on the order of the defendant who admitted to Bumpus that he instructed Smith to "[s]hoot her, shoot her" as she tried to flee. Candice Bynum testified that she saw the defendant chase Macklin out the back door, and the defendant admitted in a written statement to police that he followed Macklin when she ran out the door of the home. Macklin testified that she heard someone yelling, "Shoot her, shoot her," as she was running outside. Based upon the testimony of these witnesses, we conclude the proof was sufficient to establish the defendant's criminal responsibility for attempted second degree murder beyond a reasonable doubt.

Tennessee Code Annotated section 39-13-401(a) defines robbery as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Especially aggravated robbery is a robbery "[a]ccomplished with a deadly weapon" and "[w]here the victim suffers serious bodily injury." Tenn. Code Ann. § 39-13-403(a). The defendant was convicted of attempted especially aggravated robbery, and, thus, the State did not have to prove that anything actually was taken from the victims, only that the defendant acted "with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." Tenn. Code Ann. § 39-12-101(a)(3).

-11-

A person commits aggravated burglary when he or she enters a habitation without the effective consent of the owner and "commits or attempts to commit a felony, theft or assault" or enters with the "intent to commit a felony, theft or assault." Tenn. Code Ann. §§ 39-14-402(a), -403(a). Especially aggravated burglary is the above accompanied by serious bodily injury to a victim. Id. § 39-14-404.

The defendant's conduct obviously constituted a "substantial step toward the commission of the offense" of robbery even though nothing of value was taken from the victim. We conclude the evidence was sufficient to support the attempted especially aggravated robbery of Eisom and the especially aggravated burglary of Eisom's home. As we have stated, the trial court merged the attempted especially aggravated robbery conviction with the especially aggravated burglary conviction. On appeal, the State notes that the record does not reveal why these convictions were merged and argues that if this action was taken pursuant to Tennessee Code Annotated section 39-14-404(d), the court erred and should have modified the conviction for especially aggravated burglary to aggravated burglary. In view of the fact that the State did not appeal the merger, and the record does not reveal why the trial court merged the convictions or the State's position regarding this action, we decline to review it on appeal.

## II. Sentencing

The defendant asserts that the trial court erred by not considering mitigating factors, by applying certain statutory enhancement factors, and by imposing consecutive rather than concurrent sentences for the two attempted first degree murder convictions.

The two statutory enhancement factors utilized by the trial court in the present case, that the defendant "was a leader in the commission of the offense involving two or more criminal actors" and "the defendant was adjudicated to have committed a delinquent act or acts as a juvenile that would constitute a felony if committed by an adult," see Tenn. Code Ann. § 40-35-114(3), (21) (2003), have both been called into question by Blakely v. Washington, 542 U.S. __, 124 S. Ct. 2531 (2004), which was decided after the trial court sentenced this defendant. In Blakely, the Supreme Court applied the rule it had pronounced in Apprendi v. New Jersey, 530 U.S. 466, 120 S. Ct. 2348, 2362-63 (2000), that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory minimum must be submitted to a jury." 542 U.S. at __, 124 S. Ct. at 2536. While the defendant in this case does have an extensive criminal record as a juvenile, he does not have any prior adult criminal convictions. We have previously held that juvenile adjudications do not qualify as prior convictions under Blakely. See State v. Christopher Kirkendall, No.W2004-00784-CCA-R3-CD, 2004 WL 2083760, at *4 (Tenn. Crim. App. Sept. 16, 2004), applic. for perm. to appeal filed (Tenn. Nov. 24, 2004). We must remand for resentencing in accordance with Blakely. The mitigating factors argued by the defendant to have been applicable are that substantial grounds existed to excuse his conduct; that he played a minor role in the crimes; that because of his youth, he lacked substantial judgment; that he committed the offense under unusual circumstances; and that he acted under the duress or domination of another. See Tenn. Code Ann. § 40-35-113(3), (4), (6), (11), (12) (2003). Recounting that the defendant's crimes were

committed during a "home invasion where one homeowner is shot four times, [and] someone in the back room watching video games is shot twice," the trial court determined that none of the proffered mitigating factors were applicable, given the facts of the crimes and the defendant's horrendous criminal record as a juvenile. We concur with this assessment.

However, we have previously held that the holding in Apprendi does not in any way affect the trial court's decision to impose consecutive rather than concurrent sentences. See State v. Ira Ishmael Muhammed, No. E2003-01629-CCA-R3-CD, 2004 WL 1073889 (Tenn. Crim. App. May 10, 2004). Although we are remanding this matter for resentencing, we will review the trial court's decision that certain of the defendant's sentences should be served consecutively and the possibility that, in view of the fact that the lengths of the defendant's sentences may be altered, the court may reconsider its determinations in this regard.

As a general rule, consecutive sentences are imposed at the discretion of the trial court upon its consideration of one or more of the following statutory criteria:

> (1) The defendant is a professional criminal who has knowingly devoted such defendant's life to criminal acts as a major source of livelihood;
>
> (2) The defendant is an offender whose record of criminal activity is extensive;
>
> (3) The defendant is a dangerous mentally abnormal person as declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;
>
> (4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;
>
> (5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

(6)     The defendant is sentenced for an offense committed while on probation; or

(7)     The defendant is sentenced for criminal contempt.

Tenn. Code Ann. § 40-35-115(b) (2003). These criteria are stated in the alternative; therefore, only one need exist to support the appropriateness of consecutive sentencing.

The trial court determined that subsections (2) and (4) were applicable, explaining:

> [T]his defendant is an offender whose record of criminal activity is extensive, dating back for a number of years with the Juvenile Court system; and . . . this defendant is a dangerous offender whose behavior indicates little or no regard for human life and has no hesitation about committing a crime in which the risk to human life is high.

Further, the court explained:

> [T]here is proof in the record that a consecutive sentence is needed, and that such a sentence would reasonably be related to the severity of the offenses committed; further, that consecutive sentences would serve to protect the public or society from further criminal acts by this defendant, who resorts to aggravated criminal conduct, and that a consecutive sentence would be congruent with the general principles of sentencing, that this defendant is a dangerous offender.
>
> The Court further finds that consecutive sentenc[ing] is appropriate in that it's necessary to protect the public from criminal conduct by the defendant.

The record abundantly supports the trial court's determination that subsections (2) and (4) are applicable to the sentencing of this defendant. We note that the trial court made the additional finding, required for application of subsection (4), that consecutive sentences are reasonably related to the severity of the offenses committed by the defendant. See State v. Lane, 3 S.W.3d 456 (Tenn. 1999); State v. Wilkerson, 905 S.W.2d 933, 939 (Tenn. 1995).

## CONCLUSION

Following our review of the record, we affirm the convictions for attempted first degree murder (two counts), attempted second degree murder, and especially aggravated burglary but remand for resentencing as to each. Additionally, the judgments in all counts should be corrected

to reflect the offense date as July 1, 2002.

_____
ALAN E. GLENN, JUDGE